**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
(Northern Division)

| | | |
|---|---|---|
| YOEL-NATHAN TCHAKOUNTE PETONE, | * | |
| YANIS-MAEL TCHAKOUNTE NYA, and | | |
| YANA-BRIELLE TCHAKOUNTE TCHABERT, | * | |
| each through next friend | | Civil Action No. 1:20-cv-3028 |
| CAROLE TCHABERT TCHATCHOUA, | * | |
| 2582 Carrington Way | | |
| Frederick, MD  21702, | * | |
| | | |
| Plaintiffs, | * | |
| | | |
| v. | * | |
| | | |
| UBER TECHNOLOGIES, INC., | * | |
| 1455 Market St | | |
| San Francisco, CA  94103, | * | |
| | | |
| and | * | |
| | | |
| RASIER LLC, | * | |
| 1455 Market St | | |
| San Francisco, CA  94103, | * | |
| | | |
| Defendants. | * | |

* * * * * oo0oo * * * * *

Plaintiffs Yoel-Nathan Tchakounte Petone, Yanis-Mael Tchakounte Nya, and Yana-Brielle Tchakounte Tchabert, each through next friend Carole Tchabert Tchatchoua, by and through their undersigned counsel, Brown, Goldstein & Levy, LLP and Scarola Zubatov Schaffzin PLLC, allege as follows:

**PRELIMINARY STATEMENT**

1.      This case involves Uber's complete and utter abdication of its duty of care to the drivers who use its technology platform to perform rideshare services.  Uber has developed and commercialized some of the most sophisticated data collection and analysis in the world.  In its

core rideshare driver-passenger matching business, Uber has already employed some less sophisticated, but necessary and prudent measures such as criminal background checks to screen out criminal and dangerous drivers from using its platform to offer rides.  However, despite its capabilities and measures already in place with respect to screening drivers, Uber fails to take any such similar steps to screen the other party in the car during an Uber ride — the passenger.  At the same time, Uber discourages drivers from using their own judgment to avoid potentially unsafe situations by penalizing them for failing to accept rides.

2.      While the potential danger to an Uber driver who picks up strangers and has his back to them while focusing on the road is entirely foreseeable on a common sense basis, Uber's own research makes it patently obvious that drivers are in danger while picking up and carrying Uber passengers.  In particular, Uber's own most recent safety study shows that Uber drivers are almost as likely as Uber passengers to be subject to fatal assault during the use of the Uber platform.  Despite placing the drivers in this foreseeably dangerous situation, Uber abandons its basic duty to driver users to screen out dangerous passengers in the same way that it screens out dangerous drivers.

3.      As a direct and proximate result of Uber's failure to use any of its basic protocols for screening drivers to likewise screen passengers, or otherwise use its massive data crunching capabilities to "red flag" a dangerous passenger, Uber matched a man with a violent criminal history of assault with a firearm and carjacking to driver Beaudouin Tchakounte for an Uber Pool ride on August 27, 2019.  Within minutes of entering the car, this violent criminal shot to death both Mr. Tchakounte and a previously picked up Uber Pool passenger, 32-year old Casey Robinson.  Uber's apathy towards the safety of its drivers left two grieving families and Mr.

Tchakounte's long-term life partner and fiancé to explain to their three young children why their father was not ever coming home again.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over the subject matter and parties pursuant to 28 U.S.C. § 1332 because, as alleged below, there is complete diversity of citizenship between the plaintiffs and the defendants and the amount in controversy exceeds $75,000 exclusive of interest and costs.

5.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

6.      Defendants are subject to personal jurisdiction in this Court because they maintain continuous and systematic business operations in this District.  Furthermore, the Defendants have purposefully availed themselves of the privilege of conducting activities in the State of Maryland and Plaintiffs' claims arise out of said activities.

## PARTIES

7.      Plaintiffs Yoel-Nathan Tchakounte Petone, Yanis-Mael Tchakounte Nya, and Yana-Brielle Tchakounte Tchabert are all minor persons who reside in Frederick, Maryland.  This action is brought through their mother Carole Tchabert Tchatchoua, an adult person and a resident of Frederick, Maryland, as next friend, for wrongful death with respect to Plaintiffs' father, Beaudouin Tchakounte.   Mr. Tchakounte openly and notoriously recognized Yoel-Nathan Tchakounte Petone, Yanis-Mael Tchakounte Nya, and Yana-Brielle Tchakounte Tchabert to be his children while he was alive.

8.      Defendant Uber Technologies, Inc. ("Uber Technologies") is a Delaware Corporation with its principal place of business in San Francisco, California.

9.      Defendant Rasier LLC ("Rasier") a Delaware Limited Liability Company with its principal place of business in San Francisco, California.  It is wholly owned subsidiary of Uber Technologies and is the party that directly contracts with drivers.  Uber Technologies and Rasier may be collectively referred to herein as "Uber" or the "Company."

## STATEMENT OF FACTS

10.      Beaudouin Tchakounte was a hardworking father of four who immigrated to the United States from Cameroon twenty years ago.  He was a family man.  He lived with his fiancé, Carole Tchatchoua, and three youngest children Yoel-Nathan, Yanis-Mael, and Yana-Brielle in Frederick, Maryland.  The last photos he had posted on his Facebook account were of his mother back home in Cameroon.  At the time of his death, he had been driving for Uber for about three years to help provide for his family.  He often worked seven days a week.

11.      On the evening of August 27, 2019, Mr. Tchakounte was driving for Uber in Prince George's County, Maryland, and already had a passenger, 32-year old local construction and security worker Casey Robinson, in his car.

12.      Uber has an option called "Uber Pool" which allows a passenger to save money by sharing a ride with another passenger originating at a second location but going in the same direction.

13.      Aaron Lanier Wilson, Jr., a 42-year-old local man with a violent criminal history, used the Uber app to request an Uber Pool ride at or about 9:30 p.m. that night.  Fatefully, the Uber app matched Mr. Wilson with Mr. Tchakounte.  Mr. Wilson, who later confessed to police that he was high on PCP at the time, was picked up by Mr. Tchakounte on Indian Head Highway in Oxon Hill, Maryland.  Within minutes of getting into the car, Mr. Wilson pulled out a gun and shot both Mr. Tchakounte and Mr. Robinson at point blank range.

14.     Mr. Tchakounte and Mr. Robinson were both found deceased in Mr. Tchakounte's car on Indian Head Highway near Bald Eagle Road at approximately 9:45 p.m. that night.

15.     The police apprehended Mr. Wilson early the next morning, when, according to news reports, he confessed to the shootings.  He was charged by the Assistant State's Attorney for Prince George's County with two counts of murder, and is currently in custody awaiting trial.

16.     Prior to murdering Mr. Tchakounte and Mr. Robinson, Mr. Wilson had a violent criminal past.  On July 3, 1997, a warrant was issued for his arrest on charges of assault in the first degree, assault in the second degree, the use of a firearm in a felony or violent crime in connection with a carjacking.  Mr. Wilson ultimately entered an Alford plea to robbery and was sentenced to five years in prison.

17.     After his arrest for the murder of Beaudoin Tchakounte and his passenger Casey Robinson in 2019, Mr. Wilson was denied bail.  The judge noted that to call Mr. Wilson "a danger" would be "an understatement."

**Uber's Failure to Screen Both Types of Users**

18.     Mr. Tchakounte's death would not have happened had Uber undertaken its duty of care to drivers as co-users of its platform and applied any of the many basic safety protocols available to it.  For example, Uber could have used, but did not, the protocol it uses to screen drivers to also screen the other parties in the car — the passengers.

19.     When a driver signs up to use the Uber platform, he or she is required to upload a photo ID which is used to conduct a background check.  The 2017-2018 Uber Safety Report, which was put together by Uber itself, touts that:

> Every US driver undergoes an annual Motor Vehicle Record (MVR) review and a thorough criminal history background check before their first trip. The ridesharing industry is subject to a diverse array of laws and regulations specifying how potential drivers must be screened and/or whether those

drivers are qualified to drive on the Uber platform. While background check requirements and other driver eligibility limitations in the US vary considerably by state and even by city, Uber's own process exceeds these requirements in several important ways.

. . . .

Uber's background-check process is very rigorous. During 2017 and 2018, more than one million prospective drivers did not make it through Uber's screening process…

. . . .

Uber will disqualify individuals with any felony convictions in the last 7 years. If we identify a report for **certain serious criminal convictions**— **including** sexual assault, sex crimes against children, murder/homicide, terrorism, and kidnapping—**at any time** in the person's history, the potential driver will be disqualified according to our standards.

. . . .

Beyond performing annual background check reruns, we were the first US ridesharing company to implement continuous driver screening technology, which monitors and flags new criminal offenses through a number of data sources and then notifies us so we can take action to ensure that every driver continues to meet our high standards. Since we launched this technology, more than 40,000 drivers have been removed from the app due to continuous screening.

(Emphasis added).[1]

20.     Despite its heralded procedure for performing background checks on potential drivers, Uber conducts no such background checks on potential passengers.  To open an Uber account as a passenger, a user need only input a valid phone number and email address and input a payment method.  Permitted payment methods are credit and debit cards, PayPal, Venmo, digital wallets and Uber gift cards.  Uber's app has the technology for users to scan or take a photo of their credit card with their phone and have the account information automatically inputted.

---

[1] *See* Uber, 2017-2018 U.S. Safety Report, https://www.uber-assets.com/image/upload/v1575580686/Documents/Safety/UberUSSafetyReport_201718_FullReport.pdf?uclick_id=50161b09-dbb7-40b0-b24b-e925caac5961.

21.     Despite Uber's technological capabilities, however, passengers are not required to upload or take a photo of any form of ID that could be used to conduct a background check when they create an account.  Nor is the financial information they input used for any type of screening.

22.     Uber has elected not to screen passengers despite its knowledge, from its own research, that drivers are almost as likely as passengers to suffer a fatal physical assault during an Uber ride.[2]  Indeed, while Uber recognizes the need for vigorous background checks for drivers, passengers are subject to essentially no screening before they get into a small enclosed space with other passengers on Pool rides and a driver with his or her back to the passenger and eyes on the road.

23.     Uber also fails to remove proven problematic passengers from its platform.  Upon information and belief, if a driver reports that a passenger has harassed them, Uber will not match that passenger with that driver again.  The passenger can, however, be matched to any other driver on the platform without notification to the other potential drivers of the passenger's history.

24.     Drivers have long complained about Uber's failure to protect them from the passengers with whom they are matching them.  One rideshare driver who was shot at in Detroit told the local news that the rideshare companies provide "[n]o background check on [riders], no copy of an ID or anything.  The two rideshare companies have got to do something about that, cause it's scary for us."[3]

---

[2] *See id*.  Within the studied time frame, the victims of fatal physical assaults related to the use of the Uber platform included 8 riders and 7 drivers.

[3] *See* Heather Catallo, *Rideshare Risks: Dangers Facing Uber and Lyft Drivers*, WXYZ (Mar. 13, 2018), https://www.wxyz.com/news/local-news/investigations/rideshare-risks-dangers-facing-uber-and-lyft-drivers.

**Uber's Massive Data Collection and Analysis Capabilities**

25.     Not only does Uber already have a robust background check procedure in effect for drivers that could easily be applied to passengers, but Uber has massive data collection and analysis capabilities that it could apply to identifying and screening out dangerous users if it so chose.

26.     For example, Uber has been touting a new initiative called "Uber Movement" that "shares anonymized data aggregated from over ten billion trips to help urban planning around the world."   Uber Movement offers several products to city officials, planners and consultants, including datasets measuring zone to zone travel times across cities, street speeds, and the volume of activity on mobile devices in a given location.

27.     Financial analysts who follow Uber have noted that its data collection and analysis might be Uber's most valuable asset and a path to profitability for the Company, as it continues to rack up billions of dollars in losses every year on its core rideshare matching business.  One analyst told Reuters that "Uber has 'a wildly successful data collection on who uses it and how they use it and where they go,'" and that such data "can become profitable."[4]

28.     On a micro level, the privacy section on Uber's website discloses that the Company collects individual rider data including: name and email address, mobile number, rating(s), and the date signed up with Uber; referral code(s) issued by Uber; payment method information, such as the date the rider created and updated a payment method, the issuing bank's name, billing country, and payment method type (Visa, debit, etc.); metadata about support conversations with Uber; times and locations at which a trip was requested, started, and ended; distance traveled; trip prices

---

[4] *See* Heather Somerville, *The answer to Uber's profit challenge? It may lie in its trove of data*, Reuters (May 9, 2019), https://www.reuters.com/article/us-uber-ipo-profit-idUSKCN1SF0O5.

and currency; 30 days of mobile event data, such as device OS, device model, device language, app version, and the time and location the data was collected.

29.     Given Uber's state of the art data triangulation capabilities, it could use data pattern analysis to "red flag" potentially dangerous users, both for its own screening purposes and to give its drivers and rideshare passengers a choice about riding with potentially dangerous persons. Instead, Uber asserts publicly that it uses its capabilities to analyze traffic speeds.  It did not, in connection with the events alleged here, use that information to keep both its driver and passenger users safe from dangerous criminals on its platform.

**Uber's Perverse Incentives Putting Drivers at Risk**

30.     In addition to Uber's failure to use its current background check procedures for drivers to also apply to passengers or use its data analysis capabilities to screen out dangerous passengers, Uber's policies and procedures are set up to provide minimal information to drivers about who is getting in their car, which precludes any meaningful decision making by the drivers as to whether a passenger might be dangerous and as to whether they want to face the risk.

31.     When an Uber driver gets notification of a ride request, he or she may get the first name of the passenger, the length of the ride to the requested destination, and the location to pick up the rider.  Drivers are given no further information, such as a photo of the passenger or the passenger's destination.  With no photo and no full name, drivers have no way of verifying that the person who requested the ride is the person who is actually getting in the car.

32.     The drivers do not see the destination address until they accept the ride, the rider gets into the car, and the driver initiates the ride.  This procedure puts drivers in an especially vulnerable position because if they find out after the passenger gets in the car that the passenger wants to go to a dangerous part of town late at night, the driver must choose between cancelling

the trip with an angry and potentially dangerous person now in the backseat or continuing the trip to a potentially unsafe location.

33.     Because Uber penalizes drivers for declining or cancelling rides, if a driver arrives to pick up a passenger and is uneasy about the passenger, the driver has to decide between accepting the ride or attempting to make a living.  For example, if a driver declines a certain percentage of ride requests, he or she risks getting moved to the bottom of the queue *vis a vis* other drivers for ride requests in a busy area, such as an airport.  Drivers also risk the suspension of their Uber account for declining too many rides.

34.     In addition to penalizing drivers for declining rides, Uber offers flat bonuses or increased payouts per ride when drivers accept a certain number of rides.  Because payouts to drivers are so low in relation to their time and costs, these "bonuses" or increased payouts may be the difference between profitability or not after the driver's expenses are deducted.

35.     Uber drivers are left to put their safety at risk in order to earn a living.  With little information provided to them with which to make a judgment call on the relative safety of accepting a ride, Uber's failure to use its data analysis capabilities to screen passengers, and its failure to apply its own screening standards for drivers to the other party in the car, the passenger, drivers become vulnerable to the fate of Beaudouin Tchakounte.

36.     Had Uber undertaken to apply its driver background check procedures to passengers as well or used its massive data analysis capabilities to screen out dangerous passengers, Mr. Wilson would not have been matched for a ride with Mr. Tchakounte and/or would not have been accepted as a passenger.  Mr. Wilson would then not have been armed and high on PCP in a car with an unsuspecting Mr. Tchakounte and his other passenger, and Mr. Tchakounte and his other passenger would not have been shot by Mr. Wilson and lost their lives.

## CLAIM FOR RELIEF

### Wrongful Death

37.     The allegations set forth in the foregoing paragraphs are incorporated herein by reference.

38.     Uber owed a duty of care to Beaudouin Tchakounte as a user of its technology platform matching drivers and passengers.  The potential threat Uber drivers faced from dangerous passengers when using the Uber platform was entirely foreseeable from Uber's own safety research, which showed that drivers on the platform faced a risk of fatal physical assaults similar to the risk faced by passengers.  Indeed, Uber chose to mitigate the similar, foreseeable risk to passengers from drivers through robust screening measures (that it declined to employ to protect drivers from passengers).

39.     Uber could easily fulfill this duty in a commercially reasonable and ordinary manner by applying the same screening standards it currently applies to its drivers to its passengers. It could also fulfill this duty by using its massive data collection and analysis capabilities to predict and screen out potentially dangerous users.  Instead, Uber simply chooses not to do so.

40.     While failing to take reasonable care to keep dangerous criminals off of its platform, Uber's practices penalize drivers for making decisions based on safety concerns and incentivizes them to override those concerns, creating an even more risky environment for its driver users.

41.     In this case, Uber's failure to exercise its duty of care resulted in the platform failing to screen out a passenger who was a dangerous criminal with a history of carjacking.  Uber's failure to exercise its duty of care also resulted in Beaudouin Tchakounte not being given the choice he would have made to decline picking up a person with such a history.

42.     As a direct and proximate result of Uber's failure to screen out Mr. Wilson and its failure to provide any relevant screening information to Beaudouin Tchakounte, allowing Mr. Wilson to use the platform to be matched with drivers and in fact matching him for a ride with Mr. Tchakounte, while Mr. Tchakounte had no relevant information to decide on declining the ride to save his own life, Mr. Wilson entered Mr. Tchakounte's car and shot Mr. Tchakounte dead.

43.     As a direct and proximate result of the wrongful death of Mr. Tchakounte, his minor children Yoel-Nathan Tchakounte Petone, Yanis-Mael Tchakounte Nya, and Yana-Brielle Tchakounte Tchabert suffered the loss of their father and other damages and losses following naturally therefrom including, but not limited to, mental anguish, emotional pain and suffering, loss of protection, parental care, advice, counsel, guidance, and education, and loss of economic support from Mr. Tchakounte's income for the length of his work expectancy.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff demands relief as follows against Defendants:

(a) An award of money damages to compensate for Plaintiffs' mental anguish, emotional pain and suffering, loss of protection and parental care, advice, counsel, guidance and education;

(b) An award of money damages to compensate Plaintiffs for loss of economic support;

(c) An award of pre-judgment interest;

(d) An award of Plaintiffs' costs;

(e) Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Dated: October 19, 2020

Respectfully submitted,

_____/s/_____
Jessica P. Weber (Federal Bar No. 17893)
BROWN, GOLDSTEIN & LEVY, LLP
120 E. Baltimore Street, Suite 1700
Baltimore, Maryland  21202
Tel.:  (410) 962-1030
Fax:  (410) 385-0869
jweber@browngold.com

– and –

Richard J.J. Scarola     * *Pro Hac Vice forthcoming*
Cassandra Porsch         * *Pro Hac Vice forthcoming*
SCAROLA ZUBATOV SCHAFFZIN PLLC
1700 Broadway, 41ˢᵗ Floor
New York, New York 10019
Tel.:  (212) 757-0007
Fax:  (212) 757-0469
rjjs@szslaw.com
cp@szslaw.com

*Attorneys for Plaintiffs*