IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

YOEL-NATHAN TCHAKOUNTE
PETONE, *et al.*

v.                                                       Civil Action No. CCB-20-3028

UBER TECHNOLOGIES, INC., *et al.*

## MEMORANDUM

Mr. Beaudouin Tchakounte was an Uber driver who, tragically, was murdered by a passenger in 2019. His children, estate, and mother have sued Uber Technologies, Inc., and its wholly owned subsidiary, Rasier, LLC (collectively, "Uber"), bringing wrongful death and survival claims. (ECF 13 ¶¶ 43–49, 50–54). Uber moved to dismiss the suit for failure to state a claim (ECF 16); the plaintiffs responded (ECF 25); and Uber replied (ECF 28). The issues have been briefed, and no oral argument is necessary. Local Rule 105.6 (D. Md. 2021). For the following reasons, the motion to dismiss will be granted.

## BACKGROUND

On the evening of August 27, 2019, Uber driver Beaudouin Tchakounte was in Prince George's County driving his personal vehicle with an Uber Pool passenger, 32-year-old construction and security worker Casey Robinson. (ECF 13, Am. Compl. ¶ 13). Around 9:30 p.m., the Uber app matched Mr. Tchakounte and Mr. Robinson with a second passenger, Aaron Lanier Wilson, Jr., who would join their ride. (*Id.* ¶ 15). Mr. Tchakounte picked up Mr. Wilson on Indian Head Highway in Oxon Hill. (*Id.* ¶ 15). Within minutes of getting into the car, Mr. Wilson — who was high on PCP at the time — shot and killed Mr. Tchakounte and Mr. Robinson. (*Id.* ¶¶ 15–16).

1

Mr. Wilson had a criminal record. In 1997, he was arrested on charges of first- and second-degree assault and the use of a firearm in a felony or violent crime in connection with a carjacking. (*Id.* ¶ 18). He entered an Alford plea to robbery in 1998 and was sentenced to five years in prison. (*Id.* ¶ 18).[1]

Uber's ridesharing/transportation platform uses two apps, one for drivers and one for riders. (ECF 16-1, Mem. P. & A. Supp. Uber's Mot. Dismiss, at 1). When a driver like Mr. Tchakounte signs up to use the Uber platform, he must upload a photo ID for a background check. (ECF 13 ¶ 23). Uber disqualifies any potential drivers with felony convictions in the past seven years and for certain serious criminal convictions (including sexual assault, sex crimes against children, murder/homicide, terrorism, and kidnapping) at any time in a person's history. (*Id.*). In Maryland, the state Public Service Commission oversees background screening and licensure for drivers of taxis and ride hailing services like Uber. *See* Md. Code Ann., Pub. Util. § 10-404 (West 2018); Md. Code Regs. 20.94.01.21 (2016). Uber does not perform any comparable background screening on its passengers registered for the app (*Id.* ¶ 24), nor does Maryland law require or oversee any rideshare or taxi passenger screening. To open an account on the rider app, the user needs only a valid phone number, email address, and payment method (e.g., credit card, PayPal, etc.); the new user need not upload an ID. (*Id.* ¶¶ 24, 25).

When the driver app notifies a driver of a ride request, it tells the driver the name of the passenger, the estimated ride length, and the pick-up location, but the driver does not learn any further information (full name, precise destination) until he accepts the ride, picks up the

---

[1] In April 2021, he pled guilty to murdering Mr. Tchakounte and Mr. Robinson and was sentenced to 50 years in prison. Don Parker, *Md. man pleads guilty, gets 50 years for killing Uber driver, passenger while high on PCP*, ABC-7 WJLA (April 30, 2021), https://wjla.com/news/local/md-pleads-guilty-50-years-killing-uber-driver-passenger-pcp.

passenger, and begins the trip. (*Id.* ¶¶ 37, 38). If a driver declines too many ride requests or cancels too many accepted rides, Uber penalizes that driver, for example by moving the driver to the bottom of the ride request queue in busy areas like airports. (*Id.* ¶ 39). Uber pays flat bonuses or increases per-ride payouts when drivers accept a certain number of rides, and these add-on payments can push Uber drivers into profitability. (*Id.* ¶ 40).

Drivers, like riders, are "customers" of Uber, and they remit a service fee for Uber's software connections with riders. (ECF 25, Pls.' Mem Opp'n Defs.' Mot. Dismiss, at 8; ECF 28, Reply Support Uber's Mot. Dismiss Pls.' Am. Compl., at 6). And drivers, like riders, are at some risk of physical assault during a ride: an Uber safety report found that in 2017 and 2018, drivers experienced fatal violence almost as frequently as riders did. (ECF 13 ¶ 27).

## LEGAL STANDARD

To survive a motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim. However, the complaint must allege sufficient facts to establish those elements." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted). "Thus, while a plaintiff does not need to demonstrate in a complaint that the right to relief is 'probable,' the complaint must advance the plaintiff's claim 'across the line from conceivable to plausible.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). Additionally, although courts "must view the facts alleged in the light most favorable to the plaintiff," they "will not accept 'legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments'" in deciding whether a case should survive a motion to dismiss. *U.S.*

3

*ex rel. Nathan v. Takeda Pharm. North Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013) (quoting *Wag More Dogs, LLC v. Cozart,* 680 F.3d 359, 365 (4th Cir. 2012)).

A federal court sitting in diversity must apply the substantive law of the state in which the cause of action arose. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Here, the law of the forum state, Maryland, governs.

## ANALYSIS

### I. Leave to Amend

As an initial matter, the court grants leave for the plaintiffs to amend their complaint to include the relevant publicly available materials. (ECF 25 at 7 n.3) The federal rules direct that leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). The amendments requested would not prejudice Uber, do not evince bad faith, and would not be futile. *See Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006).

### II. Negligence

Mr. Tchakounte's family now brings a wrongful death claim (ECF 13 ¶¶ 43–49), and his estate brings a survival action (*Id.* ¶¶ 50–54). The claims allege that Uber failed to exercise its duty of care to screen passengers like Mr. Wilson, leading to Mr. Tchakounte's murder.

To state a claim of negligence, a party must allege and prove facts demonstrating "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty." *Dehn v. Edgecombe*, 865 A.2d 603, 611 (Md. 2005). This case primarily focuses on the first prong — whether Uber owed Mr. Tchakounte a duty of care and hence can be liable for his death. Uber argues that the Court

4

should dismiss the suit because Uber owed no legally cognizable duty to Mr. Tchakounte, and therefore the suit need not proceed to the factfinder to assess breach, causation, and damages.

### III. Duty

Whether a legal duty exists is a question of law to be determined by the court. *Iglesias v. Pentagon Title & Escrow, LLC*, 51 A.3d 51, 59 (Md. Ct. Spec. App. 2012) (citing *Doe v. Pharmacia & Upjohn Co., Inc.*, 879 A.3d 1088, 1092 (Md. 2005)). The Court of Special Appeals has summarized Maryland's approach to duty:

> There is no precise formula for determining the existence of a duty of care between two parties. The determination begs the essential question — whether the plaintiff's interests are entitled to legal protection against the defendant's conduct. In deciding the issue of duty, Maryland courts have adopted an analytical approach that encompasses at least two major assessments: examining the nature of the legal relationship between the parties and the likely harm that results from a party's failure to exercise reasonable care within that relationship.

*Iglesias*, 51 A.3d at 59 (internal quotations and citations omitted) (citing *Griesi v. Atlantic Gen. Hosp. Corp.*, 756 A.2d 548, 554 (Md. 2000) and *Prosser and Keeton on The Law of Torts*, § 53 at 357 (5th ed. 1984)). Whether the plaintiff is entitled to protection from the defendant is at the "core" of the duty determination. *Pharmacia*, 879 A.3d at 1093; *see also Jacques v. First Nat'l Bank*, 515 A.2d 756, 759 (Md. 1986) (citing *Prosser and Keeton*, § 53 at 357) ("'[D]uty' is . . . an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection."). Accordingly, the Court of Appeals in cases starting with *Ashburn v. Anne Arundel County*, 510 A.2d 1078, 1083 (Md. 1986), has articulated the following non-exhaustive list of factors for balancing the policy considerations inherent in the determination of whether a duty exists:

- the foreseeability of harm to the plaintiff,
- the degree of certainty that the plaintiff suffered the injury,
- the closeness of the connection between the defendant's conduct and the injury suffered,

5

- the moral blame attached to the defendant's conduct,
- the policy of preventing future harm,
- the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and
- the availability, cost and prevalence of insurance for the risk involved.

*Ashburn* identified foreseeability as perhaps the most important factor but also cautioned that foreseeability does not itself impose a duty in negligence. In cases involving personal injury, "the principal determinant of duty becomes foreseeability," a test "intended to reflect current societal standards with respect to an acceptable nexus between the negligent act and the ensuing harm." *Jacques*, 515 A.2d at 760; *Patton v. USA Rugby*, 851 A.2d 566, 571 (Md. 2004).[2] But foreseeability alone does not impose a duty in negligence terms: for example, the duty to perform must be a legal duty and not merely a moral duty, *Barclay v. Briscoe*, 47 A.3d 560, 578 (Md. 2012), and there is no duty to control a third person's conduct so as to prevent personal harm to another unless a "special relationship" exists either between the actor and the third person or between the actor and the person injured, *Patton*, 851 A.2d at 571; *Ashburn*, 510 A.2d at 1083.

The plaintiffs argue primarily that Mr. Tchakounte, as an Uber driver, was a customer of Uber, and therefore Uber owed him the duty of care that businesses owe to their customers. The plaintiffs source this business-customer duty in the law of premises liability, which finds that

---

[2] In contrast, "[w]here the failure to exercise due care creates a risk of economic loss only, courts have generally required an intimate nexus between the parties as a condition to the imposition of tort liability. This intimate nexus is satisfied by contractual privity or its equivalent." *Jacques*, 515 A.2d at 759–60 (footnote omitted). "We discern from our review of the development of the law of tort duty that an inverse correlation exists between the nature of the risk on one hand, and the relationship of the parties on the other. As the magnitude of the risk increases, the requirement of privity is relaxed—thus justifying the imposition of a duty in favor of a large class of persons where the risk is of death or personal injury. Conversely, as the magnitude of the risk decreases, a closer relationship between the parties must be shown to support a tort duty. Therefore, if the risk created by negligent conduct is no greater than one of economic loss, generally no tort duty will be found absent a showing of privity or its equivalent." *Id.* at 761. But even this privity requirement in economic-loss-only cases has eroded somewhat. *See Great N. Ins. Co. v. Recall Total Information Management*, Case No. TDC-13-1829, 2014 WL 3853968 at *3, n.2 (D. Md. 2014). Unpublished opinions are cited for the soundness of their reasoning, not for any precedential value.

landowners owe the highest duty to business invitees. Maryland courts have extended this duty beyond physical, brick-and-mortar premises to some certain service providers, and the plaintiffs argue that Uber should be counted among them. According to the plaintiffs, just as Uber owes rider-customers a duty of care and protects them by screening its drivers, the company owes driver-customers a parallel duty and should have taken measures like screening its riders and providing drivers information they can use to protect themselves.

In the alternative to duty rooted in a commercial business invitor-invitee relationship, the plaintiffs argue that Uber owed Mr. Tchakounte a duty through an employer-employee or contractee-contractor relationship, which make him a member not of the general public but rather of a definite class of foreseeable plaintiffs that Uber could compile from its records.

Uber, meanwhile, argues that the plaintiffs' complaint fails to state a duty the company owed to Mr. Tchakounte. Uber focuses on foreseeability: Uber could not have foreseen that Mr. Wilson specifically would smoke PCP, possess an illegal firearm, summon an Uber, and commit a double murder inside the vehicle.[3] Further, Uber says it would be impossible to protect Uber drivers from any and all harms, because the Uber platform allows riders to bring guests or to order rides for third parties, individuals whom Uber cannot readily screen as they need not be registered with the app. Uber also disagrees with the plaintiffs' argument that digital gig-economy businesses like Uber are analogous to brick-and-mortar businesses subject to premises liability and disputes that Mr. Tchakounte was a business invitee under Maryland law; the company notes that Mr. Tchakounte drove his own car the night of his murder.

---

[3] The court sets aside the question of whether Mr. Wilson's intentional tort was a superseding cause that would prevent recovery from Uber; this is a question of causation, and this motion's focus is the duty inquiry.

For the reasons that follow, the court finds that Uber did not have a duty to conduct background screenings of passengers. Maryland law does not clearly extend brick-and-mortar premises liability to digital businesses like Uber, the risk of harm was not sufficiently foreseeable, and the broader societal consequences weigh against finding a common-law duty here without clearer legislative declaration.

A. *Premises liability*

"The duty of care owed by an owner or occupier of land to someone entering on the property depends on whether the person is an invitee, a licensee, or trespasser. An 'invitee' is a person invited or permitted to enter or remain on another's property for purposes connected with or related to the owner's business." *Giant of Maryland LLC v. Webb*, 246 A.3d 664, 674 (Md. Ct. Spec. App. 2021) (citing *Rowley v. Baltimore*, 505 A.2d 494, 498 (Md. 1986)) (internal quotations omitted). Landowners owe the highest duty to business invitees. *Tennant v. Shoppers Food Warehouse Md. Corp.*, 693 A.2d 370, 374 (Md. Ct. Spec. App. 1997). Nevertheless,

> "an owner or occupier of land only has a duty to exercise reasonable care to protect the invitee from injury caused by an unreasonable risk that the invitee would be unlikely to perceive in the exercise of ordinary care for his or her own safety, and about which the owner knows or could have discovered in the exercise of reasonable care. The duties of a business invitor thus include the obligation to warn invitees of known hidden dangers, a duty to inspect, and a duty to take reasonable precautions against foreseeable dangers."

*Id.* (cleaned up).[4]

This duty extends to dangers that "may be caused by the negligent acts of [the business invitor's] employees, or even of customers, where [the business invitor], as a reasonably prudent

---

[4] The Court of Special Appeals in *Tennant* cited Prosser and Keeton to provide further color: "The occupier must not only use care not to injure the visitor by negligent activities, and warn him of hidden dangers known to the occupier, but he must also act reasonably to inspect the premises to discover possible dangerous conditions of which he does not know, and take reasonable precautions to protect the invitee from dangers which are foreseeable from the arrangement or use of the property." *Tennant*, 693 A.2d at 388 (citing W. Page Keeton, et. al., PROSSER AND KEETON ON THE LAW OF TORTS, § 61, at 425–26 (5th ed. 1984) (footnotes omitted)).

person, [] should have anticipated the possible occurrence and the probable results of such acts." *Giant Food, Inc. v. Mitchell*, 640 A.2d 1134, 1135 (Md. 1994) (quoting *Eyerly v. Baker*, 178 A. 691, 694 (Md. 1935)). A landowner is liable for physical injury caused to a business invitee by a condition on the premises "if, but only if,":

> a) he knows or reasonably could have discovered that the condition presented an unreasonable danger to invitees; and
>
> b) he should expect that they will not discover or realize the danger, or fail to protect themselves against it; and
>
> c) he fails to exercise reasonable care to protect them against the danger.

*Deering Woods Condo. Ass'n v. Spoon*, 833 A.2d 17, 24 (Md. 2003) (adopting Restatement (Second) of Torts § 343 (Am. Law Inst. 1965)). But the owner or possessor of the land is not an insurer of the safety of his customer who is on the premises. *Giant of Maryland*, 246 A.3d at 674–75. No presumption of negligence by a landowner or possessor arises merely because the injury occurred on the premises of the owner or possessor. *Id.*

The plaintiffs offer a plausible framework for defining the uncertain status of rideshare drivers and their fraught and multi-dimensional relationship with Uber. The drivers' status as customers — who sign a contract with Uber and remit fees to use the Driver app — clarifies their relationship to Uber in a way that sidesteps the common debate over their status as employees or contractors. But even if they are customers who would be entitled to protection in a hypothetical brick-and-mortar Uber storefront, the court is aware of no Maryland state court case or statute extending premises liability into the digital realm and thus triggering the Restatement (Second) of Torts § 343 premises liability analysis. Therefore, although rideshare drivers may be considered customers of Uber, the premises liability argument fails to control this case.

Maryland law does find a duty in certain other business-customer relationships outside of premises liability, and the plaintiffs cite several cases to this effect. Certain professionals, such as physicians, attorneys, architects, and public accountants, owe a tort duty of care to their customers, as may those in occupations requiring peculiar skill. *Jacques*, 515 A.2d at 763 (citing *St. Paul at Chase v. Mfrs. Life Insur.*, 278 A.2d 12, 26 (Md. 1971)).

The plaintiffs also cite two instances of economic-loss-only cases that focus on the relationships between the parties; these cases stand for the proposition that a tort duty may attach in economic injury cases where contractual privity can show that an intimate nexus exists between the parties. First, a bank processing its customers' loan application owed a tort duty of care flowing from banks' public nature, their relation to public welfare, the "high degree of integrity and responsiveness" traditionally required of their officers, and the customers' particular dependence in that case on the bank's exercise of due care. *Jacques*, 515 A.2d at 763–64. Second, a real estate title company performing a title search owed a duty of care to its customers given "the relationship of the parties . . ., the significance of the title search, the details outlined in the preliminary title commitment report, and the fact that an insured looks to the title commitment for the purpose of making business decisions." *100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co.*, 60 A.3d 1, 17 (Md. 2013).

None of these business-customer duty examples quite fits the relationship between Uber and Mr. Tchakounte. The nature of the business does not militate for a duty: for better or for worse, no licensing authority or professional regulatory body has arisen to construct professional standards for software engineering and design companies in the way we expect of professionals like physicians and attorneys. If there is a duty to be found in this relationship, it is in the driver-customers' particular dependence on Uber, which calls to mind the caselaw's recognition of a

10

customer's dependence on a bank or title company. Though Uber offers the fact that drivers can accept or reject any ride offered to them, the reality is more complex: the company's bonus system and its algorithm's control over assignments exert real pressure on drivers to accept the rides Uber chooses for them — even without knowing anything about the rider or their destination beyond their first name and the length of the ride. Drivers are theoretically free to reject any ride they would like, but those attempting to make a living understand the precarious nature of that freedom in the face of a power imbalance and information asymmetry favoring Uber.

Even so, the most important counterpoint is that, in a personal injury case such as Mr. Tchakounte's, foreseeability is the prime consideration (*see* § II.B), not the existence of an intimate nexus or contractual privity between the parties. And even assuming that an analysis of their relationship is appropriate, this dependence is not enough on its own to create a business-customer duty outside of the premises liability analysis. The bank in *Jacques* had obtained from the borrowers "rather extraordinary financing provisions" that left those individuals "particularly vulnerable and dependent upon the Bank's exercise of due care." *Jacques*, 515 A.2d at 762. This one-sided dynamic in a large, one-time transaction invites the unusual protection of tort law in a way that repeated, routine transactions between Mr. Tchakounte and Uber — not unlike any taxi driver's transactions — do not.[5]

In sum, Maryland case law does not extend the duty to a business invitee from physical premises to services or the Internet, and the limited examples of duties owed by other service

---

[5] A lending bank in Maryland owes its typical, arm's-length customers no fiduciary duty. *Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 778 (4th Cir. 2013) (citing *Kuechler v. Peoples Bank*, 602 F. Supp. 2d 625, 633 (D. Md. 2009) (quoting *Yousef v. Trustbank Savs., F.S.B.*, 568 A.2d 1134, 1138 (Md. 1990)) ("It is well established that the relationship of a bank to its customer in a loan transaction is ordinarily a contractual relationship between debtor and creditor and is not fiduciary in nature") (internal quotations omitted)).

11

providers do not analogize cleanly to Uber. This analysis, however, is only part of the broader duty analysis, which continues below.

### B. Foreseeability

In a personal injury case like Mr. Tchakounte's, foreseeability is the principal — though not exclusive — determinant of duty. *Jacques*, 515 A.2d at 760. Although the law of premises liability does not apply directly here (*see* § II.A), a Maryland Court of Special Appeals case from that context nonetheless helps illuminate the question of whether Mr. Tchakounte's harm was foreseeable. In *Corinaldi v. Columbia Courtyard, Inc.*, the court described the general factual scenarios in which an injured person may claim that a landowner is liable for a third party's intentional act:

> (1) preexisting unsafe conditions that the landowner could have foreseen would contribute to criminal activity unless ameliorated, e.g., a need for lighting or security personnel in the case of a location with a history of crime due to poor lighting;
>
> (2) the landowner's knowledge of the specific third party's prior criminal or tortious conduct such that the assault was foreseeable and preventable; or
>
> (3) knowledge of events occurring on the premises prior to and leading up to the third party's wrongful conduct, making imminent harm foreseeable.

873 A.2d 483, 492 (Md. Ct. Spec. App. 2005) (citing *Smith v. Dodge Plaza Ltd. P'ship*, 811 A.2d 881 (Md. 2002); and *Univ. of Maryland v. Rhaney*, 858 A.2d 497 (Md. 2004), aff'd on other grounds, 880 A.2d 357 (Md. 2005).

Given that Uber had no real-time knowledge of Mr. Wilson's wrongdoing, the plaintiffs' claim has features of the first two patterns. First, they argue that Uber's 2017–18 Safety Report gave Uber notice of fatal driver assaults, a preexisting unsafe condition that they could have

ameliorated with rider screening or more information for drivers. Uber, they say, implemented driver screening protocols and rider safety protocols because of a "known aggregate risk that some passengers will suffer harm" and should have done the same for drivers, because the Safety Report revealed that drivers face fatal assaults at only slightly lesser frequency than passengers, albeit without meaningful screening of potential passengers. They argue the harm to Mr. Tchakounte must therefore be foreseeable.

Second, the plaintiffs argue that Uber's sophisticated data analysis capabilities and large trove of customer data mean it ought to have known specifically of Mr. Wilson's prior robbery conviction or other data-based red flags — for example, mistakes or mis-clicks that might have indicated he was under the influence of drugs.

Neither aspect of the plaintiffs' claim is convincing as to foreseeability. Assuming the Safety Report shows Uber was aware of fatal assaults on drivers at the time[6] of Mr. Tchakounte's murder, the risk of a fatal injury was extremely low: 7 of the 750,000 Uber drivers[7] in 2018 (0.00093%) experienced a fatal assault. This falls far short of analogs in other tort liability contexts, where courts have looked for relatively higher incidences of harm before finding harm foreseeable. *See, e.g., Scott v. Watson*, 359 A.2d 548, 554 (Md. 1976). To find that

---

[6] The Safety Report anchors the plaintiffs' claim that Uber knew of the risks to drivers and thus Mr. Tchakounte's murder was foreseeable. Uber insists that, though the Report examines data from 2017 and 2018 (prior to Mr. Tchakounte's August 2019 murder), its publication in December 2019 several months after the murder and its inclusion of data up to October 2019 shows that Uber had not analyzed the safety report data by the time of the murder. (ECF 28 at 2). Construing both this timeline and the factual question of Uber's internal understanding of the risks to drivers in the light most favorable to the plaintiffs at the 12(b)(6) stage of litigation, the court assumes that Uber was aware of the incidence of violence against drivers even before the actual publication of the Report.

[7] Memorandum from the United States House of Representatives Committee on Transportation and Infrastructure Staff, to Members of the Subcommittee on Highways and Transit, *Subcommittee Hearing on "Examining the Future of Transportation Network Companies: Challenges and Opportunities"* at 5 n.22 (Oct. 11, 2019), https://www.congress.gov/116/meeting/house/110062/documents/HHRG-116-PW12-20191016-SD001.pdf (citing Jonathan Hall, *An analysis of CEEPR's Paper on "The Economics of Ride-Hailing"*, Uber, https://medium.com/uber-under-the-hood/an-analysis-of-ceeprs-paper-on-the-economics-of-ride-hailing-1c8bfbf1081d (Mar. 2, 2018) (last visited Jan. 26, 2022)).

Uber should have foreseen such a low-probability event would be to hold Uber liable as an insurer of its drivers' safety.

And even assuming that Uber reasonably should have known of Mr. Wilson's single relevant 21-year-old conviction for a robbery he committed at age 19,[8] the harm Mr. Tchakounte experienced was not foreseeable. Nothing in the record suggests that Uber would have had reason to believe Mr. Wilson had more than one violent offense, and that was from two decades prior. *See Rhaney v. Univ. of Maryland E. Shore*, 880 A.2d 357, 366, 366 n.10 (Md. 2005) (noting that one disciplinary action for an assault at a campus protest did not make foreseeable a subsequent assault in a dorm room: "Our view of foreseeability is not nearly wide enough to include a *possible* result, but deals more with the *probability* of that result"). It is worth noting that Mr. Wilson's robbery conviction may not even have excluded him from driving for Uber, which (absent any more stringent state law requirement) looks past a seven-year cutoff only for convictions of sexual assault, sex crimes against children, murder/homicide, manslaughter, terrorism, and kidnapping. Uber 2017–2018 Safety Report at 22, available at: https://www.uberassets.com/image/upload/v1575580686/Documents/Safety/UberUSSafetyReport_201718_FullR eport.pdf?uclick_id =50161b09-dbb7-40b0-b24b-e925caac5961. The serious harm that befell Mr. Tchakounte, while tragic, was not sufficiently foreseeable to impose a duty on Uber.

### C. The consequences of a duty

Foreseeability is only one of the factors that Maryland courts consider when evaluating "the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection," a set of factors that includes the "convenience of

---

[8] The complaint and this motion's briefing do not note any other criminal convictions in Mr. Wilson's past.

administration" and the "extent of the burden to the defendant and consequences to the community of imposing a duty." *Ashburn*, 510 A.2d at 1083 (citations omitted).

At first glance, it seems straightforward to impose a duty to screen all rider-users for the protection of driver-users from the foreseeable risk of passenger violence. Uber possesses rider-user registration information and tremendous data analysis capability and could mandate that rider-users — though perhaps not non-registered guests or third parties — undergo a background screening comparable to that required of driver-users. The plaintiffs' proposed rider screenings are, in a narrow sense, conveniently (if expensively, to Uber) administrable.

But imposing a duty here raises concerns. Uber is very much in the business of transportation, and not merely software, and this invites comparisons to its 20th-century forebears in the taxi industry. Both Uber drivers and taxi drivers must undergo a criminal background check as part of their application for a license from Maryland's Public Service Commission. MD Code, Public Utilities, §§ 10-104(a)(1)(v), (b); § 10-404(b)(2)(i). The court is aware of no Maryland case law or statute, however, imposing a duty on a taxicab dispatcher to perform a background screening on that passenger for the driver's protection.

To impose on Uber a common-law duty to screen passengers would open the door to a similar screening duty on taxi dispatchers or any other company that sends a service provider (e.g., plumbers) to a private shared space where there is some risk of interpersonal conflict or crime. Or perhaps such a duty might be cordoned off, applying only to dispatchers who, like Uber, possess some heightened capacity or special way to know of a customer's criminal history. But the court is aware of no Maryland case law that finds a duty based on the alleged tortfeasor's

15

unusual sophistication.[9] Further, it is unclear why such a duty would not creep outward, expanding to require traditional taxi companies to contract with, say, a quick-turnaround background screening company for the protection of their drivers. These implications rise above the context-specific protections (e.g., bullet-proof glass in a gas station) that the plaintiffs note in their brief. Finding a common-law duty here implicates legacy institutions operating in spaces tightly regulated by the State of Maryland, and this court hesitates to initiate such a significant expansion of duty absent a clear indication that it aligns with Maryland public policy.

Finally, finding a duty to screen here carries significant implications for formerly incarcerated people's participation in society. Mr. Wilson was convicted in 1998, 21 years before the night he murdered Mr. Tchakounte. Sixteen years had passed since the end of his five-year prison sentence. Given the violent nature of his prior offenses — he was arrested for assault and for the use of a firearm in a felony or violent crime in connection with a carjacking, and ultimately convicted of robbery — it is possible that some system similar to Uber's driver-screening procedures might have disqualified Mr. Wilson had it been applied to riders. But this court again hesitates to find that no one with a violent crime in their past, no matter how long ago, may use a rideshare service (or summon a taxi or plumber). If a common-law screening duty risks creating such a public policy outcome, then it is too blunt an instrument for the matter at hand.

### D. The province of the legislature

These boundary-drawing problems cry out for a regime crafted by the legislature. "In determining the public policy of the State, courts consider, as a primary source, statutory or

---

[9] Maryland courts might elevate the standard of care for an existing duty based on a party's sophistication, as with the learned professions, but the existence of a duty is a separate question from the appropriate standard of care. *Warr v. JMGM Grp., LLC*, 70 A.3d 347, 359 (Md. 2013) (citing William L. Prosser, Law of Torts 205–07 (4th ed. 1971)).

constitutional provisions." *Felder v. Butler*, 438 A.2d 494, 499 (Md. 1981) (declining to judicially institute dram shop liability because the legislature had not yet created it by statute despite alcoholic beverages' long history of pervasive regulation).

To be sure, the absence of a state law on a particular matter is not necessarily conclusive evidence of Maryland's public policy or legislative intent not to regulate a particular field. *See Warr*, 70 A.3d at 395–96 (Md. 2013) (Adkins, J. dissenting) (discussing bills that were offered but then withdrawn or kept in committee).[10] But the court is aware of no rider screening legislation ever offered for the General Assembly's consideration. Meanwhile, the law around driver screening is so explicit, *see* Maryland Code, Public Utilities Article § 10-404, that this court cannot infer a comparable state public policy supporting rider screening. The determination of whether to mandate rider screenings "involves significant public policy considerations and is best left to the General Assembly," which "is in a far better position than this court to gather the empirical data and to make the fact finding necessary to determine what the public policy should be." *Warr*, 70 A.3d at 364 (cleaned up).

## CONCLUSION

For the reasons discussed above, while the court certainly regrets the tragic loss of Mr. Tchakounte and the hardship to his family, Uber's motion to dismiss must be granted. A separate Order follows.

2/3/22
Date

CCB
Catherine C. Blake
United States District Judge

---

[10] Judge Adkins cites *City of Balt. Dev. Corp. v. Carmel Reality Assocs.* for the proposition that "rejection of a bill may not be evidence of intent 'because the General Assembly may well have concluded that the rejected amendment warranted further investigation before acting on it or decided not to enact the amendment for a myriad of other reasons.'" *Id.* (citing 910 A.2d 406, 424 (Md. 2006)) (cleaned up). She suggests that this is especially true when a bill is kept in committee rather than being voted against on the floor. *Id.*